## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ZEYNEP UNAL,

      Plaintiff,

vs.                         Case No.  1:13-cv-00367 LAM/WPL

LOS ALAMOS PUBLIC SCHOOLS,
LOS ALAMOS PUBLIC SCHOOLS SCHOOL BOARD,
EUGENE SCHMITT, KATHRYN VANDENKIEBOOM,
in their individual capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [*Doc. 127*]

**THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment and Memorandum in Support (Doc. 127)*, filed October 19, 2014.  Plaintiff filed her response to the motion on November 26, 2014 [*Doc. 144*] and, pursuant to the Court's order requiring her to correct and clarify her citations to the record [*Doc. 157*], filed an amended response on January 23, 2015 [*Doc. 158*].  Defendants filed their reply to the motion on December 19, 2014 [*Doc. 149*].  Pursuant to 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned to conduct any and all proceedings in this case, including the entry of a final judgment.  [*Docs. 7* and *8*].  Having considered the motion, response, reply, record of the case, and relevant law, the Court **FINDS** that *Defendants' Motion for Summary Judgment and Memorandum in Support (Doc. 127)* should be **GRANTED**.

## FACTUAL BACKGROUND[1]

In her Second Amended Complaint, Plaintiff states that she is a Muslim, Turkish-born special education teacher employed by the Los Alamos Public Schools (hereinafter "LAPS"). [*Doc. 96* at 1].  Plaintiff has taught in LAPS since 2004.  [*Doc. 158* at 1].  Plaintiff worked at Aspen Elementary School from 2006 to 2012.  [*Doc. 127* at 3].  At Aspen Elementary School, Plaintiff worked as a special education teacher, specifically a Gifted and Talented Education (hereinafter "GATE") teacher.  *Id.*  Ms. Vandenkieboom became Principal at Aspen Elementary School during the 2008-2009 school year.  *Id.* at 4.  Ms. Vandenkieboom was Plaintiff's direct supervisor from 2008 to 2012.  [*Doc. 158* at 9].

Plaintiff alleges that Ms. Vandenkieboom and other staff at Aspen Elementary School made negative comments about students, students' families, and Plaintiff that were ethnically derogatory.  Specifically, Plaintiff alleges that Ms. Vandenkieboom: (1) stated that a group of Hispanic and Native American boys did not deserve the dirt they walk on and that she wished they would die; (2) asked the Los Alamos Police Department to go to the homes of Mexican students to collect signatures on certain forms; (3) referred to a Vietnamese family as "the little people" or "the small people," which elicited laughter from staff members; and (4) allowed her staff to joke about the names of ethnically diverse students and families.  [*Doc. 158* at 9-10]. Plaintiff also alleges that Ms. Vandenkieboom and her staff spoke derogatorily about "the valley people" when referring to Hispanic students and families from the Espanola valley, and stated that the people from this area would come to Los Alamos to steal their property.  *Id.* at 10. Plaintiff alleges that the staff at Aspen Elementary School joked about the name of an Asian student, Ms. Vandenkieboom allowed the staff to make official announcements over the

---

[1] Except where otherwise noted, the following facts are undisputed or construed in the light most favorable to Plaintiff.

intercom in feigned foreign accents, and Ms. Vandenkieboom singled out a female Hispanic student for harassment, challenged this student's medical excuses from school, and repeatedly called her family and threatened to dismiss the girl from school. *Id.* Plaintiff also alleges that Ms. Vandenkieboom advocated demoting a Hispanic boy from first grade back to kindergarten without having the legally-required IEP addendum meeting. *Id.*

With regard to Plaintiff's treatment at Aspen Elementary School, Plaintiff contends that Ms. Vandenkieboom treated her as if she did not know what she was doing, but did not treat white teachers the same way; corrected Plaintiff's pronunciation of certain words in a condescending and aggressive manner; told teachers they did not have to attend the IEP meetings of Plaintiff's students, even though Plaintiff contends that all teachers of all special education students are legally required to attend their students' IEPs; directed Plaintiff to issue grades to her gifted students in the area of their giftedness, which Plaintiff contends is in violation of the law; considered giving Plaintiff the responsibility for teaching the entire school math; told other teachers that Plaintiff did not work hard; avoided looking Plaintiff in the eye; asked Sherry Sanchez, the special education contact person at Aspen Elementary School (*see Doc. 158-3*, Exhibit C, at 2) about Plaintiff's performance, but not about other teachers' performances; asked all of the teachers at Aspen Elementary School, except Plaintiff, about what changes should be made to the gifted program; did not invite Plaintiff to other meetings to discuss changes to the gifted program; made negative remarks about Plaintiff's caseload and the gifted program at two of the meetings where she did not invite Plaintiff; asked a substitute teacher about Plaintiff's work performance; when other teachers were discussing a scene from a well-known movie, stated that Plaintiff "wouldn't know about this" because Plaintiff was "not from here;" did not acknowledge Plaintiff's accomplishments; did not attend special events to

celebrate Plaintiffs' students' accomplishments; in the 2010-2011 school year, assigned Plaintiff nearly double the number of students than permitted under state regulation, when no other teachers at Aspen had an overload that year; failed to a hire an assistant for Plaintiff until February 2011;[2] tried to persuade Plaintiff to hire someone white as her assistant, instead of an Indian-born woman who was more qualified, whom Plaintiff then hired; and frequently asked Plaintiff's assistant if Plaintiff was treating the assistant well.  [*Doc. 158* at 11-14].  Plaintiff also contends that a member of the staff called Plaintiff "a turkey from Turkey." *Id.* at 12.  Plaintiff makes additional allegations about behaviors by a group of teachers she states were known as the "informal 'vice principals,'" who Plaintiff contends excluded, ostracized and were dismissive of Plaintiff.  *Id.* at 14-15.  In addition, Plaintiff states that Ms. Vandenkieboom asked her why she was at a Christmas concert at LAPS, but thanked another teacher for her attendance at the event. [*Doc. 127* at 5].

On March 4, 2011, Ms. Vandenkieboom met with Plaintiff to discuss issues that Ms. Vandenkieboom had with Plaintiff's work performance, specifically: (1) Plaintiff's failure to timely communicate with teachers prior to parent-teacher conferences; (2) Plaintiff's failure to timely deliver paperwork to the school district's Student Services department; and (3) Plaintiff's students' perception of having "free time" during her GATE class time.  *See* [*Doc. 127* at 7] and [*Doc. 158* at 16].  Ms. Vandenkieboom states that Plaintiff did not think that there was a problem regarding the delivery of the student progress reports to the teachers.  [*Doc. 127* at 7].  On March 10, 2011, Plaintiff wrote a letter to then Assistant Superintendent Paula Dean complaining of Ms. Vandenkieboom's discussion with her on March 4, 2011.  *Id.* and [*Doc. 127-12*,

---

[2]  Defendants state that during the time period between LAPS becoming aware of Plaintiff's course overload and the time that an Instructional Assistant was hired, Ms. Vandenkieboom assigned other Instructional Assistants who were already working at the school to provide classroom assistance to Plaintiff.  [*Doc. 127* at 5]. Plaintiff states that she disputes this statement because these assistants were only assigned sporadically without any continuity of assigned personnel.  *See* [*Doc. 158* at 4].

Exhibit L].  In this letter, Plaintiff stated that she thinks that Ms. Vandenkieboom "has problems with the GATE program, and special education in general," and Plaintiff "wonder[ed] if [Ms. Vandenkieboom] has a problem with [her] because of [Plaintiff's] culturally different background or for some other reason."  [*Doc. 127-12*, Exhibit L, at 3].  Plaintiff concluded that all of the issues she raised in her letter constituted "appropriate cause . . . to believe that [Ms.] Vandenkieboom is biased against [Plaintiff]."  *Id.* at 4.  Finally, Plaintiff asked to be assigned a supervisor other than Ms. Vandenkieboom.  *Id.* at 5.

On March 14, 2011, Ms. Vandenkieboom issued Plaintiff three letters titled "Letters of Direction" regarding: (1) Plaintiff's failure to timely report student progress to teachers during Parent Teacher Conference Week and outlining complaints from parents about Plaintiff's failures to respond to them about their children's progress (*Doc. 127* at 8 and *Doc. 127-13*, Exhibit M, at 1-3); (2) Plaintiff's failure to timely deliver students' Individual Education Plans ("IEPs") to the district's Student Services office (*Doc. 127-13*, Exhibit M, at 4-5); and (3) reports of students having "free time" during Plaintiff's class periods (*id.* at 6-7).  Each letter referred to complaints reported to Ms. Vandenkieboom regarding the issues raised in the letters, and documentation of all but one[3] of the referenced complaints are included in the record before the Court.  *See* [*Doc. 127-4*, Exhibit D, at 7-10]; [*Doc. 127-7*, Exhibit G]; [*Doc. 127-8*, Exhibit H]; [*Doc. 127-9*, Exhibit I]; [*Doc. 158-8*, Exhibit H]; and [*Doc. 158-37*, Exhibit NN]. (e-mails from teachers and parents regarding complaints about Plaintiff).  Each letter provided directions to Plaintiff regarding how to address the issues, and included the statement: "Failure to comply with this directive will result in a formal letter of reprimand," and "any deviation from this directive will lead to immediate and more severe discipline, up to and including termination or discharge."

---

[3] Letter of Direction 3 refers to an e-mail from Dina Alexander, parent of a fourth grader (*Doc. 127-13*, Exhibit M, at 6), but this e-mail is not included in the evidence before the Court.

[*Doc. 127-13*, Exhibit M, at 3, 4 and 7].  The letters explained that a copy of the letters would be placed in Plaintiff's personnel file after ten days of receipt of the letters, and that Plaintiff could respond to the letters within ten days, and the responses would also be placed in her personnel file.  *Id.* at 3, 5 and 7.  On either March 21 or April 6, 2011,[4] Plaintiff submitted a Level I Grievance to the school district regarding the Letters of Direction, in which Plaintiff states that she received the letters on March 21, 2011 (despite their date of March 14, 2011), and requested that the letters be removed from her personnel file, that Ms. Vandenkieboom be removed from supervising Plaintiff, that Plaintiff be considered for a transfer to another site for the following school year, and that Plaintiff receive compensation for the dates she was given an overload of students.  [*Doc. 127-14*, Exhibit N] and [*Doc. 158-22*, Exhibit W].  Plaintiff submitted a letter to Ms. Vandenkieboom, dated April 5, 2011, stating that it was a "Response to Letter of Direction 2."  *See* [*Doc. 127-15*, Exhibit O] and [*Doc. 158-20*, Exhibit U].[5]

In April 2011, what Plaintiff calls a "pre-grievance" meeting (pursuant to the collective bargaining agreement) was held between Dr. Gail Irestone, then Coordinator of LAPS Human Resources, Union Representative Ellen Mills, Ms. Vandenkieboom, and Plaintiff, at which Plaintiff presented the reasons for her grievance.  [*Doc. 127* at 8] and [*Doc. 158* at 19].  Plaintiff states that she was told at that meeting by Gail Irestone that she would have a different supervisor, that she could transfer to another school that fall, and that Dr. Irestone would get back to Plaintiff about extra compensation for her student overload.  *Id.*  On April 7, 2011,

---

[4] Plaintiff states that she initiated the grievance process on April 6, 2011 (*Doc. 158* at 19), and Defendants state that the grievance was submitted on or about March 21, 2011 (*Doc. 127* at 8).  The grievance itself is undated; however, the copy filed by Plaintiff contains a handwritten note that it was "received April 6, 2011 by Gail Irestone [and] delivered to K. Vandenkieboom by Gail."  *See* [*Doc. 127-14*, Exhibit N] and [*Doc. 158-22*, Exhibit W, at 1].  The Court has determined that the date the grievance was submitted is not material to the Court's resolution of Defendants' motion for summary judgment.

[5] While Defendants state that Plaintiff submitted responses to each of the Letters of Direction (*Doc. 127* at 8), the parties have only submitted Plaintiff's letter titled "Response to Letter of Direction 2."

Ms. Vandenkieboom issued Plaintiff a positive evaluation in all areas. [*Doc. 127* at 8] and [*Doc. 127-16*, Exhibit P].  Plaintiff states that "[s]everal days later," Ms. Vandenkieboom, Ms. Dean, and Dr. Irestone "aggressively confronted Plaintiff in her classroom" while she was teaching, and told her that Ms. Vandenkieboom would continue as her supervisor, and that Plaintiff would be moved to a portable classroom behind the school, effective immediately, claiming that Plaintiff "must have misunderstood what was said on April 6, 2011 because she did not speak English."  [*Doc. 158* at 19].

On May 11, 2011, LAPS issued its formal response to Plaintiff's Level I Grievance, offering to remove the Letters of Direction if Plaintiff agreed to remove her response(s) to those letters, stating that Ms. Vandenkieboom would remain as Plaintiff's supervisor at Aspen Elementary School, and offering Plaintiff a payment of $200.00 to compensate her for the student overload, while noting that Plaintiff had received partial assistance from school staff during the time of the overload.  [*Doc. 127* at 8-9] and [*Doc. 127-17*, Exhibit Q].  The letter further states that Plaintiff was offered a transfer to another elementary school as a GATE teacher, but Plaintiff turned down the offer and elected to stay at Aspen Elementary School.  *Id.*[6] Plaintiff states with regard to the offer of a transfer that she was not given any information about the new role or the program and was only given one hour to decide whether to accept the position.  [*Doc. 158* at 6] (disputing the statement in ¶ 38 of Defendants' Statement of Fact,

---

[6] This letter states that the offer to transfer schools was made on May 27, 2011, which must be a mistake since this letter was issued on May 11, 2011.  Neither party clarifies when the offer of a transfer was made or submits any documentation of this offer, but Defendants apparently disagree that the offer was made on May 27, 2011.  *See* [*Doc. 127* at 8-9] ("The District reiterated that it had agreed to transfer the Plaintiff to another elementary school campus on May 27, 2011 **[sic]**, and reiterated that Plaintiff had refused that offer.") (emphasis added).

*Doc. 127* at 8-9). [7]   Plaintiff states that on May 23, 2011, she met with Ms. Sanchez, Ms. Sanchez' husband, George, and Superintendent Schmidt, and was promised by Superintendent Schmidt that he would remove the Letters of Direction, assign Plaintiff a new supervisor, and that Plaintiff would not be retaliated against for reporting Ms. Vandenkieboom's behavior.   [*Doc. 158* at 19-20] (citing Ms. Sanchez' deposition at *Doc. 158-3*, Exhibit C, at 17-18).   Plaintiff states that Superintendent Schmidt did not honor any of his promises. [*Doc. 158* at 20] (citing Ms. Sanchez' deposition at *Doc. 158-3*, Exhibit C, at 18-19).

Plaintiff states that, on July 15, 2011, she filed a revised grievance.  *See* [*Doc. 158* at 20] (citing *Doc. 158-38*, Exhibit OO).[8]  On July 26, 2011, Plaintiff wrote a letter to Superintendent Schmidt, titled "Appeal of Level One Grievance."  *Id.* (citing *Doc. 158-15*, Exhibit P).  This letter states that Plaintiff was appealing the dismissal of her grievance, which she received on July 19, 2011 from Dr. Irestone.  [*Doc. 158-15*, Exhibit P].[9]  On July 28, 2011, Superintendent Schmidt responded to Plaintiff's July 26, 2011, letter, stating that the Letters of Direction are not grievable because they are discretionary acts of supervision regarding Plaintiff's work performance.  [*Doc. 127-22*, Exhibit V, at 1-2].  Superintendent Schmidt stated that the letters will not be removed from Plaintiff's personnel file and Ms. Vandenkieboom will remain as Plaintiff's supervisor, and he denied the additional requests raised in Plaintiff's July 26, 2011

---

[7]  In their reply, Defendants do not dispute Plaintiff's statement that she was only given one hour to decide whether to accept the position at the new school, stating only that "Plaintiff has alleged she was told on two occasions that she could transfer to another school for the 2011-2012 school year."  [*Doc. 149* at 3] (citing to Plaintiff's statement of facts IIII [sic] and RRRR in her response, *Doc. 157*).  However, in the July 6, 2012 letter to Plaintiff, LAPS denies giving Plaintiff only one hour to decide.  *See* [*Doc. 127-22*, Exhibit V, at 3].  The Court finds that the amount of time Plaintiff was given to decide whether or not to take this position is not material to the Court's resolution of Defendants' motion for summary judgment.

[8]  The Court notes that the cited reference does not contain the revised grievance, and neither party has provided the Court with a copy of the revised grievance.  The cited reference appears to be an excerpt of a summary description of Plaintiff's first grievance and her "second, or revised Level I Grievance, . . . filed on July 15 and dated July 18 (not a typo)."  [*Doc. 158-38*, Exhibit OO, at 1].

[9]  Neither party has provided the Court with a copy of the dismissal of Plaintiff's grievance.

letter.  [*Doc. 127* at 9] (citing *Doc. 127-22*, Exhibit V, at 2-3).  Superintendent Schmidt also stated that Plaintiff could apply for voluntary reassignment to any vacant position for which she is qualified, but that there were no available full time GATE positions at any White Rock schools, as Plaintiff had requested.  *Id.* (citing *Doc. 127-22*, Exhibit V, at 3).  He also denied Plaintiff's request for additional compensation, noting that Plaintiff was provided assistance from Instructional Assistants during the time of her overload of students.  *Id.* at 9-10 (citing *Doc. 127-22*, Exhibit V, at 3).  Finally, he denied Plaintiff's allegation that she was being "targeted" because of her national origin, or that she was being harassed by her supervisor.  [*Doc. 127-22*, Exhibit V, at 3].  On August 11, 2011, the Los Alamos Federation of United School Employees (the "union") filed a Level III Grievance with LAPS on behalf of Plaintiff, which was an appeal of the letter from Superintendent Schmidt.  *See* [*Doc. 127* at 10] and [*Doc. 127-23*, Exhibit W, at 2].  This grievance disputed Superintendent Schmidt's statement that the Letters of Direction were not disciplinary in nature.  *Id.*  This grievance also stated that Superintendent Schmidt violated the Collective Bargaining Agreement by failing to meet with Plaintiff or a union representative within ten days after receipt of an appeal of a Level One decision.  *Id.* at 3.

In an undated document, the School Board issued the following findings regarding Plaintiff's grievances: that the matter was disciplinary in nature and, thus, grievable; that the grievance filed on July 15, 2011 was untimely and, thus, should be dismissed; and that Ms. Vandenkieboom acted appropriately in providing professional guidance to Plaintiff, however, the inclusion of certain language rendered the Letters of Direction disciplinary in nature.  [*Doc. 127-24*, Exhibit X].  The School Board, therefore, recommended removing the letters from Plaintiff's personnel file and replacing them with one new letter, and replacing the phrase "failure to follow these directives may lead to more severe disciplinary action. . ." with

"failure to follow these directives may lead to disciplinary action." *Id.* The School Board further directed the Superintendent to schedule training and provide ongoing guidance to the principals and other supervisors regarding the progressive disciplinary process, and directed the Administration to hire additional teachers and/or instructional assistants to remedy extreme overloads in a more expeditious manner. *Id.* The School Board also directed the Superintendent to revise regulation 4125R to stipulate a timeframe for turning in IEPs to special education services, and recommended that each student's progress within their IEPs be shared with their regular education teacher at a minimum prior to each parent-teacher conference and prior to the issuance of the final report card. *Id.* Finally, the School Board acknowledged that Plaintiff might be more comfortable at another site and, noting that Plaintiff had been offered a comparable position at another school which she declined, encouraged her to apply for any other position that becomes available in the school district for which she is qualified. The School Board stated: "We recognize that errors were made by both sides throughout this grievance process." *Id.* The revised Letter of Direction was placed in Plaintiff's personnel file on November 14, 2011. [*Doc. 127-28*, Exhibit BB].

On July 17, 2011, Plaintiff was hospitalized after suffering a fall after exercising hard at an exercise class. *See* [*Doc. 127* at 9], [*Doc. 158* at 20], and [*Doc. 158-34*, Exhibit KK].[10] On August 8, 2011, Plaintiff applied for unpaid medical leave of "4-6 months" under the Family Medical Leave Act ("FMLA"), stating that she was experiencing post-traumatic stress disorder,

---

[10] Plaintiff describes this episode as a "panic attack that resulted in her fainting and suffering a concussion" (*Doc. 158* at 20), and her medical record describes it as a "syncopic episode, which was likely vasovagal" and that Plaintiff suffered a fall after "exercising hard at an exercise class" (*Doc. 158-34*, Exhibit KK, at 1). "Syncopic" is defined as a "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow," and "vasovagal" is defined as "[r]elating to the action of the vagus nerve upon the blood vessels." Stedman's Medical Dictionary (27th ed., Lippincott Williams & Wilkins 2000) at 1745 and 1934. In addition, in Plaintiff's doctor's notes regarding this episode, as well as Plaintiff's "extraordinary stress over the past year," he states that Plaintiff has had problems with her marriage and her mother was diagnosed with colon cancer and placed in the hospital. [*Doc. 158-34*, Exhibit KK].

panic disorder, and depression.  [*Doc. 158* at 21], and [*Doc. 158-24*, Exhibit Y].  Plaintiff

remained on unpaid medical leave for the "whole of the 2011-2012 school year."  [*Doc. 158*

at 21] (citing *Doc. 158-25*, Exhibit AA).  On May 7, 2012, LAPS issued Plaintiff a notice of

intent to rehire her for the 2012-2013 school year, stating that it must be returned within fifteen

days.  [*Doc. 127* at 11] (citing *Doc. 127-29*, Exhibit CC).  On May 23, 2012, Plaintiff returned

the notice of intent to rehire,[11] with the following requests for accommodation described in

attached letters from her primary care physician and her clinical psychologist: (1) that she not be

supervised by Ms. Vandenkieboom; (2) that she be protected from any reprisals or retaliation;

and (3) that she not be required to travel between two school sites.  [*Doc. 127* at 11] (citing

*Doc. 127-30*, Exhibit DD).  On July 6, 2012, counsel for the school district notified Plaintiff's

counsel that Plaintiff had not timely returned the notice of intent to hire.  [*Doc. 127* at 11] (citing

*Doc. 127-31*, Exhibit EE).  Defendants state that, upon receiving notification that Plaintiff did

not receive the notice of intent to hire in a timely manner, the district considered Plaintiff's

signed notice timely, and issued her a contract for the 2012-2013 school year on August 2, 2012,

which Plaintiff signed on August 7, 2012.  [*Doc. 127* at 11] (citing *Doc. 127-32*, Exhibit FF).

Plaintiff was assigned to Mountain Elementary School, where she is not supervised by

Ms. Vandenkieboom, and Plaintiff continues to work there.    *Id.* (citing *Doc. 127-33*,

Exhibit GG, at 5).  Ms. Vandenkieboom continues to be employed at Aspen Elementary School.

*See* [*Doc. 158* at 7].

On February 1, 2013, a settlement agreement was entered into by LAPS and the union,

pursuant to which, *inter alia*, Plaintiff received $1500.00 from the Board of Education of LAPS,

and the three Letters of Direction dated March 14, 2011, the consolidated Letter of Direction,

---

[11]  In her letter, Plaintiff stated that she "received the letter of intent by mail on Saturday May 19[,] 2012."
[*Doc. 127-30*, Exhibit DD, at 1].

and all records stemming from or leading to the March 14, 2011 letters were permanently removed from Plaintiff's personnel file and any other files maintained by the school district. [*Doc. 127* at 12] and [*Doc. 127-34*, Exhibit HH, at 2-3]. In addition, pursuant to the settlement agreement, the Board was to require the School District Administrative Team to complete cultural sensitivity training during the 2012-2013 school year. [*Doc. 127-34*, Exhibit HH, at 3].

Plaintiff states that, on January 18, 2013, she received from the New Mexico Human Rights Bureau a Notice of Right to Sue for national origin discrimination and retaliation, and, on March 26, 2013, she received from the Equal Employment Opportunity Commission ("EEOC") a Notice of Right to Sue for national origin discrimination and retaliation. [*Doc. 158* at 21].[12] On April 9, 2014, the EEOC issued Plaintiff a Notice of Right to Sue for disability discrimination and retaliation under the Americans with Disabilities Act. [*Doc. 158* at 22] and [*Doc. 127-35*, Exhibit II, at 14].

Plaintiff raises the following claims in her Second Amended Complaint: (1) that she was discriminated against on the basis of her national origin, and subjected to retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; (2) that she was discriminated against in violation of the New Mexico Human Rights Act ("NMHRA"), N.M.S.A. 1978 §§ 28-1-1, *et seq.*; (3) that she was discriminated and retaliated against on the basis of her race, religion, or ethnic characteristics, in violation of 42 U.S.C. § 1981; (4) that her due process and equal protection rights under 42 U.S.C. § 1983 were violated; (5) that her rights under the Americans with Disabilities Act of 1990 ("ADA") were violated; (6) breach of her employment contract; (7) conspiracy to interfere with her civil rights; and (8) negligent

---

[12] Neither party has provided the Court with copies of these Notices of Right to Sue.

supervision and training, "i.e., negligent operation of a school building."  [*Doc. 96* at 13-20].[13]

As relief, Plaintiff asks for: (1) compensatory damages, including back pay for the 2011-2012

school year with all appropriate increases in salary and benefits to which she would have been

entitled, loss of earnings, loss of benefits, loss of promotional opportunities, los of career

opportunities, lost earning capacity, medical expenses, emotional distress and other

consequential, incidental and special damages; (2) punitive and exemplary damages; (3) a public

apology to the Plaintiff; (4) pre- and post-judgment interest; (5) reasonable attorney's fees and

costs.  *Id.* at 21.

Defendants' motion for summary judgment asks the Court to dismiss all of Plaintiff's

claims.  [*Doc. 127* at 26-38].  In Plaintiff's response to the motion for summary judgment, she

states that she "stipulates to dismissal of her claim[s] for religious discrimination and for

negligent supervision of Kathryn Vandenkieboom."  [*Doc. 158* at 1].  Plaintiff contends that she

has identified genuine issues of material fact regarding her remaining claims, and asks the Court

to deny Defendants' motion for summary judgment.  *Id.* at 22-50.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be

rendered "where no genuine issue of material fact exists, and the moving party is entitled to

judgment as a matter of law."  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th

Cir. 2006).  "[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect

---

[13]  While Plaintiff does not specifically raise a "hostile work environment" claim in her Second Amended
Complaint, both parties state that Plaintiff has raised this claim as well.  *See* [*Doc. 127* at 2] and [*Doc. 158* at 3].

the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Initially, the "moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment (*see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988)), but rather must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).

In reviewing a motion for summary judgment, the court must "examine the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir. 2010) (citation and internal quotation marks omitted). Its function at this stage "is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## ANALYSIS

### I.  National Origin/Race Discrimination
### (Title VII, § 1981, NMHRA and Equal Protection Claims)

In the absence of direct evidence, claims of discrimination, hostile work environment, and retaliation under Title VII are all subject to the burden shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  This is true for discrimination claims brought under § 1981, the NMHRA and the Equal Protection Clause, as well.  *See Martin v. Central States Emblems, Inc.*, No. 04-3417, 150 Fed. Appx. 852, 858, 2005 WL 2503838 (10th Cir. Oct. 11, 2005) (unpublished) (explaining that the merits of a § 1981 claim are assessed "under the allocation burdens set out in *McDonnell Douglas*"); *Gioia v. Pinkerton's Inc.*, 194 F. Supp. 2d 1207, 1220 (D.N.M. 2002) (explaining that the "[p]laintiff's burden of establishing a prima facie case under the New Mexico Human Rights Act, NMSA § 28-1-7, is actually identical to his burden under Title VII" (citation omitted); and *English v. Colorado Dept. of Corrections*, 248 F.3d 1002, 1007 (10th Cir. 2001) (recognizing that the *McDonnell Douglas* analysis applies to § 1983 claims of race discrimination).

Under the *McDonnell Douglas* analysis, the establishment of a *prima facie* case of discrimination creates a presumption that the employer unlawfully discriminated or retaliated against the employee.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  This presumption places upon the defendant the burden of producing an explanation to rebut the *prima facie* case, "*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason."  *See id.* at 506-507 (citation omitted).  Once the defendant has met its burden, the presumption of unlawful discrimination "drops from the case."  *See St. Mary's Honor Center*, 509 U.S. at 507 (citation and internal quotation marks

omitted).  If the defendant meets its burden of producing an explanation, the plaintiff bears the

ultimate burden of persuading the trier of fact that the stated reason for the defendant's action

was a pretext, *i.e.*, the facially nondiscriminatory reason was a cover-up for a decision motivated

by unlawful discrimination.  *See EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th

Cir. 1992).  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them unworthy of credence and hence infer that the

employer did not act for the asserted nondiscriminatory reasons."  *Morgan v. Hilti, Inc.*,

108 F.3d 1319, 1323 (10th Cir. 1997) (citation and internal quotation marks omitted).

### A. Prima Facie Case

To establish a *prima facie* case of discrimination, a plaintiff must show that (1) she

belongs to a protected class; (2) she suffered an adverse employment action; and (3) the

challenged action took place under circumstances giving rise to an inference of discrimination.

*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).  Here, Defendants contend that

Plaintiff has failed to establish a *prima facie* case of discrimination because she did not suffer an

adverse employment action as a result of the Letters of Direction or the withdrawal and

reinstatement of her offer of employment.  [*Doc. 127* at 26-29].  Defendants contend that the

letters were not adverse employment actions because Plaintiff did not suffer a loss in pay or a

significant change in her employment conditions as a result of their issuance.  *Id.* at 27-28.

Defendants contend that the withdrawal of Plaintiff's offer of employment was not an adverse

employment action because: (a) she fails to show that it was done for any reason other than

LAPS was unaware that Plaintiff had untimely received the offer of employment and, thus, could

not have timely returned her acceptance of it; and (b) Plaintiff did not suffer any loss of pay for

the 2012-2013 school year because she was subsequently hired for that school year, and because she has worked for LAPS continuously since that time. *Id.* at 29. In addition, Defendants contend that Plaintiff has not administratively exhausted her claim that the withdrawal and reinstatement of the offer of employment was a discriminatory act because it was not raised in Plaintiff's charges with either the EEOC or the New Mexico Human Rights Division. *Id.*

In response, Plaintiff contends that the year of unpaid medical leave she took in 2011-2012 was an adverse employment action because it was a constructive discharge by Defendants. [*Doc. 158* at 23-24]. Plaintiff contends that she was constructively discharged because the conditions of her employment were "so intolerable that a reasonable person in her circumstances would have felt compelled to resign." *Id.* Plaintiff also contends that the March 2011 Letters of Direction were adverse employment actions because they were disciplinary in nature and threatened more severe consequences in the future, including termination. *Id.* at 32-33. Plaintiff contends that she exhausted her administrative remedies with regard to the withdrawal and termination of her offer of employment because she included the action in her April 25, 2013 charge of disability discrimination. *Id.* at 33 (citing *Doc. 158-23*, Exhibit X). Plaintiff further contends that the withdrawal of the offer of employment was an adverse employment action because she was terminated as a result. [*Doc. 158* at 33].

In reply, Defendants contend that, because Plaintiff is still employed by the school district, is no longer supervised by Ms. Vandenkieboom, and the Letters of Direction have been removed from her personnel file, she has not suffered an adverse employment action. [*Doc. 149* at 10-11]. Defendants contend that Plaintiff's claim that her unpaid leave was a constructive discharge and, thus, an adverse employment action should fail because it was not raised in Plaintiff's Complaint and, nevertheless, is unsupported by the record. *Id.* at 11-12.

### 1. *Letters and Withdrawal of Employment Offer As Adverse Employment Actions*

The Tenth Circuit liberally defines the phrase "adverse employment action," on a case-by-case basis. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). In *Roberts v. Roadway Express*, 149 F.3d 1098, 1104 (10th Cir. 1998), where the plaintiff received twenty warning letters, the Tenth Circuit held that multiple written warnings that impacted the probability an employee would be terminated are adverse employment actions. *See also Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005) (explaining that a written reprimand may constitute an adverse action if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities). Here, the March 2011 Letters of Direction stated: "Failure to comply with this directive will result in a formal letter of reprimand," and "any deviation from this directive will lead to immediate and more severe discipline, up to and including termination or discharge." [*Doc. 127-13*, Exhibit M, at 3, 4 and 7]. These letters, therefore, impacted the probability that Plaintiff would be terminated if she did not follow the letters and, thus, they constitute adverse employment actions. Similarly, the withdrawal of Plaintiff's employment offer is an adverse employment action. While Defendants contend that these actions were not adverse because they were eventually remedied when the letters were withdrawn and Plaintiff's offer of employment reinstated, the Tenth Circuit has held that adverse actions that are subsequently withdrawn are still adverse. *See Roberts*, 149 F.3d at 1104 ("Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn."). Defendant's contention that the withdrawal of Plaintiff's offer of employment was not an adverse action because it did not result in any loss of pay also fails, because adverse actions are not limited to those resulting in monetary losses. *See Sanchez v. Denver Public Schools*,

164 F.3d 527, 532 (10th Cir. 1998) (citation omitted). For these reasons, the Court finds that Plaintiff has shown that she has suffered an adverse employment action as a result of the Letters of Direction and the withdrawal of her offer of employment.

Defendants contend that Plaintiff failed to exhaust her administrative remedies with regard to the withdrawal of the offer of employment. However, the record shows that in Plaintiff's April 24, 2013 Charge of Discrimination based on her disability, she raised the allegation that she was threatened with termination of her employment if she did not withdraw her requests for accommodation and alleged facts in support of her claim. *See* [*Doc. 158-23*, Exhibit X]. The Court finds that this complies with Title VII's exhaustion requirement that Plaintiff must present facts sufficiently related to the actions underlying each claim. *See Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007). While it may not have been entirely clear from Plaintiff's April 24, 2013 Charge of Discrimination that she was raising a claim based on unlawful termination, the Tenth Circuit has held that it liberally construes administrative pleadings. *Id.* The Court, therefore, finds that Plaintiff has administratively exhausted her claim regarding the withdrawal of her offer of employment.

### 2. Constructive Discharge As An Adverse Employment Action

Next, the Court addresses Plaintiff's contention that taking unpaid medical leave for a year was an adverse employment action because that action constituted a constructive discharge. The Court finds that Defendant's contention that this issue was not raised in Plaintiff's Second Amended Complaint (*Doc. 149* at 11) is without merit, as this claim was raised in that pleading (*see Doc. 96* at 10, ¶ 56). The Court also takes note of Defendants' contention that the Tenth Circuit requires a resignation for a finding of constructive discharge, and that Plaintiff's medical leave and subsequent return to employment at LAPS does not constitute a constructive discharge.

[*Doc. 149* at 12].   While Defendants state that "[Tenth] Circuit precedent on constructive discharge requires a resignation" (*id.*), and the cases cited by Defendants involved resignations, the Court notes that these cases do not specifically state that a resignation is required to consider a constructive discharge claim, only that the standard is that a reasonable person in the plaintiff's position would feel compelled to resign (*see, e.g., Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004)).   Nor does the Court find any cases in this Circuit stating that a claim that a plaintiff felt compelled to take medical leave would not qualify as a constructive discharge claim.   Absent clear authority stating that a constructive discharge claim requires the employee to resign, instead of only taking unpaid medical leave, the Court elects to consider on the merits whether Plaintiff's taking unpaid medical leave was a constructive discharge.

The Tenth Circuit has explained that a plaintiff's burden in establishing constructive discharge is substantial. *See PVNF*, 487 F.3d at 805 ("requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable") (citation omitted), and *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) ("The bar is quite high in . . . cases [alleging constructive discharge]: a plaintiff must show [s]he had no other choice but to quit." (citation omitted).   "A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."   *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004) (citations omitted).   The Tenth Circuit has found a showing of constructive discharge in an age discrimination case where a plaintiff produced evidence showing that, on multiple occasions, her supervisor asked her to quit while citing her age and her "image;" her supervisor repeatedly confronted her with a litany of performance

shortcomings; her supervisor took away longstanding job responsibilities and gave her inadequate information and training to perform her new duties.  *See Acrey v. American Sheep Industry Assn.*, 981 F.2d 1569, 1574 (10th Cir.1992).  However, an employee cannot survive summary judgment merely by producing evidence showing that working conditions were difficult or unpleasant.  *See Exum*, 389 F.3d at 1135.  For example, in *PVNF*, the EEOC produced evidence demonstrating that the defendant repeatedly subjected the plaintiff and other female employees to sexually explicit and derogatory remarks.  487 F.3d at 794.  Even so, the Tenth Circuit, after applying an objective test, concluded that the EEOC had failed to produce sufficient evidence demonstrating that working conditions were so intolerable that "a reasonable person in [the plaintiff's] position would have felt compelled to resign."  *Id.* at 806.  Likewise, in *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1384 (10th Cir. 1991), an Iranian supervisor sued his employer under Title VII for constructive discharge and produced evidence showing that he resigned because his employer: (1) made derogatory remarks about the fact that he was Iranian; (2) ordered him to take a polygraph examination because of his national origin; (3) belittled and mistreated him at company seminars; and (4) ordered him to fire or eliminate other Iranians employed by the company because of their national origin.  *Id.* at 1384.  Despite these facts, the Tenth Circuit concluded the workplace was not sufficiently intolerable that the plaintiff was constructively discharged, but freely elected to resign.  *Id.* at 1386.

Here, Plaintiff contends that many of the allegations recited in the Factual Background section *supra* resulted in a workplace that was so intolerable that Plaintiff felt compelled to resign, including allegations such as: Ms. Vandenkieboom's and her staff's negative or derogatory statements about and treatment of non-white or foreign-born students and their families; a staff member calling Plaintiff a "turkey from Turkey;" Ms. Vandenkieboom

21

ridiculing Plaintiff's pronunciation of certain words in front of other teachers, asking her why she was at a Christmas concert, avoiding looking Plaintiff in the eye, telling Plaintiff she would not know about a certain movie because Plaintiff was "not from here," telling teachers they did not have to attend Plaintiff's students' IEP meetings, and asking others about Plaintiff's performance without also asking about other teachers' performances; Plaintiff's student overload and the delay in hiring her an assistant; Ms. Vandenkieboom's solicitation of negative feedback from her "unofficial vice principals" and asking them to put it in writing; the issuance of the Letters of Direction without sufficient basis; and the denial of Plaintiff's request for a different supervisor and removal to a portable classroom. *See* [*Doc. 158* at 24-31].

While Plaintiff includes a large number of allegations, evidence in the record shows that Plaintiff was not present for, and did not know about, some of the statements made by Ms. Vandenkieboom and the school staff regarding non-white or foreign-born students and their families. *See, e.g.,* [*Doc. 158-4*, Exhibit D, at 14] (Plaintiff's deposition testimony, stating that she did not hear Ms. Vandenkieboom make derogatory remarks about Hispanic families and was not aware of the police officer being sent to a family's home to obtain consent for a Special Education referral). The Court recognizes that the Tenth Circuit has held that derogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment claim, and that harassment of other racial minorities may be relevant to this type of claim; however, the plaintiff must still present evidence that she knew about the offending behavior. *See Hernandez v. Valley View Hospital Assoc.*, 684 F.3d 950, 959 (10th Cir. 2012). Regarding Plaintiff's allegation that Ms. Vandenkieboom said that a group of Hispanic and Native American boys "don't deserve the dirt they walk on and that she wished they would die" (*see Doc. 158* at 9-10), a witness who was present for this statement said that it

was made after a meeting regarding a voicemail these boys had left stating that "she is a terrible principal and her snatch smells," and the suspicion that these boys had broken Ms. Vandenkieboom's window at school and some lights in the parking lot (*Doc. 158-2*, Exhibit B, at 12-13).  While the Court does not condone Ms. Vandenkieboom's statement, what is relevant to this case is that Plaintiff was not present for this remark, the remark does not mention or relate to the boys' race or national origins in any way, and the remark appears to be made in response to the boys' inappropriate voicemail rather than because of their race or ethnicity.

In addition, with regard to Plaintiff's allegations that Ms. Vandenkieboom corrected Plaintiff's pronunciation, did not make eye contact with her, asked her why she was at a Christmas concert, and told her that she would not know about a certain movie because she was "not from here" (*Doc. 158* at 25), while these allegations may show a difficult or unpleasant working environment, they do not present evidence of an environment where Plaintiff was confronted with directly discriminatory statements, repeated confrontation regarding her performance shortcomings, or a situation where she could not perform her job responsibilities. Plaintiff alleges that Ms. Vandenkieboom told other teachers that they did not have to attend Plaintiff's students' IEPs, which could affect Plaintiff's job; however, Plaintiff does not state whether any of the teachers actually failed to attend these meetings or if her job performance was affected by Ms. Vandenkieboom's action.  Plaintiff's allegation that the Letters of Direction were issued without a sufficient basis, which is addressed further *infra*, fails to note that Ms. Vandenkieboom received complaints directly related to the issues she raised in the letters as part of her duties as Principal and as Plaintiff's immediate supervisor.  *See* [*Doc. 127-4*, Exhibit D, at 7-10]; [*Doc. 127-7*, Exhibit G]; [*Doc. 127-8*, Exhibit H]; [*Doc. 127-9*, Exhibit I];

[*Doc. 158-8*, Exhibit H]; and [*Doc. 158-37*, Exhibit NN] (documentation sent to Ms. Vandenkieboom regarding complaints about Plaintiff).   Plaintiff also fails to state why moving her to a portable classroom was anything other than an inconvenience, or how it affected her job performance.   This is also the case with Ms. Vandenkieboom asking others about Plaintiff's work performance, which, as Plaintiff's Principal, would be an appropriate action on her part.   Plaintiff fails to provide any support for her allegation that Ms. Vandenkieboom's solicitation of input regarding Plaintiff's work performance constitutes an intolerable working situation.   The only allegation Plaintiff raises that was overtly related to Plaintiffs' national origin was the statement by a staff member that Plaintiff was a "turkey from Turkey."  [*Doc. 158* at 25].   However, Sherry Sanchez testified that she was present for this comment and that the staff member who made the comment "felt very poorly about it," and "went and apologized prolifically to [Plaintiff] afterwards because she realized it was offensive."   [*Doc. 149-1*, Exhibit A, at 2].

In addition, while the parties agree that Plaintiff had a student overload in the 2010-2011 school year, Plaintiff does not make a showing that this large number of students was given to her without her approval and, instead, admitted in her March 10, 2011 letter to Assistant Superintendent Dean that she "accepted a very large caseload this year."   [*Doc. 127-12*, Exhibit L, at 3].   Moreover, Defendants have presented evidence that Ms. Vandenkieboom assigned other staff to help Plaintiff while an assistant was in the process of being hired full time (*see Doc. 127-3*, Exhibit C, at 7 and 10), and Plaintiff only disputed that evidence by stating that the help was sporadic without continuity of assigned personnel (*see Doc. 158* at 4).

Finally, the Court finds that Plaintiff's contention that she was constructively discharged also fails because Plaintiff was offered employment at a different elementary school as a GATE

teacher, which is the same position she held at Aspen Elementary School, but turned down the offer.  Plaintiff states she was only given one hour to decide whether to accept the position, but that does not explain why she did not take the offer when she had been asking for a change in supervisor, which this new position would have given her.  Plaintiff fails to explain why the treatment by Ms. Vandenkieboom and the staff at Aspen Elementary School was so intolerable that she had no choice but to take unpaid leave for an entire year, and yet, when offered a position at another school with a new principal and different staff, Plaintiff refused the offer. Furthermore, Plaintiff did not resign her position but, instead, requested medical leave well beyond the time usually allowed under the Family Medical Leave Act (*see* 29 U.S.C. § 2612(a)(1)(D), stating that qualified employees are allowed up to twelve weeks of unpaid leave each year for serious health problems), which Defendants approved.  Significantly, Defendants offered Plaintiff a job at another school, which she refused, but still kept her job open and again offered her a job at another school a year later.  Plaintiff's decision to continue her employment the following school year at a different school further belies her contention that the treatment she alleges was so intolerable that she had no choice but to take unpaid medical leave. In addition, the Court notes that there is some evidence to suggest that it was Plaintiff's attorney who suggested Plaintiff take the leave of absence from work, as stated in Plaintiff's medical records.  *See* [*Doc. 158-34*, Exhibit KK] ("Her attorney wonders if she should take some time off").  For these reasons, the Court finds that Plaintiff has not made a showing that a reasonable person in the same circumstances would have felt forced to resign from Plaintiff's job, and, thus Plaintiff's year of unpaid medical leave is not a constructive discharge and is not an adverse employment action, especially since Plaintiff had the opportunity to change schools, which she refused, and then, later, voluntarily requested leave, which Defendants accommodated.

## B. Legitimate, Nondiscriminatory Reasons

Since the Court has found that the Letters of Direction and the withdrawal of the offer of employment were adverse employment actions, the Court next considers Defendants' contention that they had legitimate, nondiscriminatory reasons for those actions.  With regard to the Letters of Direction, Defendants contend that Ms. Vandenkieboom received multiple complaints concerning Plaintiff in the areas of reporting her students' progress to their regular education teachers, timely submission of her students' IEPs to the district office, and her students' perception of "free time" in her classes.  [*Doc. 127* at 28].  With regard to the withdrawal of the offer of employment, Defendants contend that the school district was unaware that Plaintiff had not timely received the offer of employment and, therefore, could not timely return a signed copy of the offer.  *Id.* at 28-29 and [*Doc. 149* at 12].  Defendants state that, when they became aware of the issue, they hired Plaintiff for the 2012-2013 school year, and she has been working for LAPS since that time.  [*Doc. 149* at 13].

To articulate a legitimate, nondiscriminatory reason for the employment actions taken, Defendants need only to produce admissible evidence which would allow the jury to conclude that the employment decisions were not motivated by impermissible discriminatory reasons.  *See Flasher Co.*, 986 F.2d at 1317-18.  To meet their burden, Defendants do not "need to litigate the merits of the reasoning," nor do they "need to prove that the reason relied upon was bona fide, . . . [or] prove that the reasoning was applied in a nondiscriminatory fashion."  *Id.* at 1316.  Moreover, "a mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."  *Id.* at 1322 n.12.

The Court finds that the record supports a finding that Defendants had legitimate, nondiscriminatory reasons to issue the Letters of Direction and for the withdrawal of the offer of

employment.  Regarding the Letters of Direction, Ms. Vandenkieboom had received complaints from other teachers regarding the timeliness of Plaintiff's submission of her students' reports to their regular education teachers and describing complaints from parents that they did not know how their children were doing in Plaintiff's special education class; regarding Plaintiff's submission of her IEPs to the Student Services office; and regarding Plaintiff's students' perception of "free time" in her classes.  *See* [*Doc. 127-4*, Exhibit D, at 7-10]; [*Doc. 127-7*, Exhibit G]; [*Doc. 127-8*, Exhibit H]; [*Doc. 127-9*, Exhibit I]; [*Doc. 158-8*, Exhibit H]; and [*Doc. 158-37*, Exhibit NN, at 2].  Ms. Vandenkieboom raised these issues with Plaintiff in a March 4, 2011 meeting, and Ms. Vandenkieboom testified that the reason she issued the Letters of Direction thereafter was because she did not think that Plaintiff was going to address the issues she raised with her in their meeting.  *Id. See* [*Doc 127-3*, Exhibit C, at 5] (stating: "I didn't feel like she heard me.  I felt like I wasn't getting any traction on the conversation," and "I felt like she thought that it wasn't a problem, the way that she didn't produce student progress reports and get them into regular ed. teachers' hands.  You know, it just didn't seem like it was a big deal to her.").  The Court finds that Defendants have, therefore, offered legitimate, nondiscriminatory reasons for issuing the Letters of Direction.

With regard to the withdrawal of the offer of employment, Defendants explain that the offer is dated May 7, 2012, and states that Plaintiff had fifteen (15) calendar days from her receipt of the offer in which to submit written notice of her acceptance or rejection of the offer. [*Doc. 127* at 28-29] and [*Doc. 127-29*, Exhibit CC].  The letter Plaintiff wrote to the Superintendent accepting the offer of employment is dated May 23, 2012, which is past the fifteen days, presuming Plaintiff was given the letter on May 7, 2012.  [*Doc. 127-30*, Exhibit DD].  While Plaintiff states in her May 23, 2012 letter to the Superintendent that she

received the offer on May 19, 2012 (*Doc. 158-27*, Exhibit CC), Plaintiff presents no evidence that the school district intentionally delayed mailing the letter, other than stating that it was postmarked on May 16, 2012, and Plaintiff has not presented a copy of that postmark to the Court.  Regardless, even if the letter was postmarked May 16, 2012 instead of May 7, 2012, Defendants' statement that they did not think Plaintiff's return of the letter was timely based on the date they thought the letter was given to Plaintiff constitutes a sufficient showing that would allow a jury to conclude that the employment decision was not motivated by an impermissible discriminatory reason.   Therefore, this evidence, coupled with the evidence that, once Defendants learned that Plaintiff had not received the offer of employment timely, they accepted her acceptance of their job offer, provides legitimate, nondiscriminatory reasons for the adverse employment actions.

### C. Pretext

Having found that Defendants have met their burden of articulating legitimate, nondiscriminatory reasons for the adverse actions, "the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason is pretextual, *e.g.*, that it is unworthy of belief."  *English*, 248 F.3d at 1008.  With regard to the Letters of Direction, Plaintiff contends that the complaints received by Ms. Vandenkieboom are pretextual reasons for issuing the letters because Ms. Vandenkieboom solicited the complaints, and because the letters were incorrect regarding a policy of reporting special education students' progress to regular education teachers and regarding when IEP paperwork was to be delivered to the Student Services office.  [*Doc. 158* at 34-37].  For the withdrawal of the offer of employment, Plaintiff contends that Defendants either backdated the offer or failed to mail it for a week after it was dated.  *Id.* at 38.

28

The Court finds that Plaintiff fails to show a genuine dispute of material fact as to whether Defendants' proffered reasons for the adverse employment actions are pretextual. While the record contains evidence indicating that Ms. Vandenkieboom may have solicited documentation regarding Plaintiff (*see Doc. 158-37*, Exhibit NN, at 2, e-mail from Katie Watson to Ms. Vandenkieboom stating: "Chelly told me you were soliciting documentation about [Plaintiff]."), Plaintiff fails to show that Ms. Vandenkieboom's reasons for issuing the Letters of Direction were pretextual.  Plaintiff does not present any evidence that the teachers and parents who submitted complaints about Plaintiff were lying about the concerns they had, or that Ms. Vandenkieboom's motive in soliciting these comments was anything other than fulfilling her responsibilities as a Principal and as Plaintiff's supervisor.  Ms. Vandenkieboom testified in her deposition that she "had teachers making comments to [her] verbally, and [she] said, 'Put it in writing,'" and they did.  [*Doc. 127-3*, Exhibit C, at 4]; *see also* [*Doc. 158-5*, Exhibit E, at 7] (deposition of Ms. Vandenkieboom, stating in response to whether she solicited written comments about Plaintiff:

> What was happening is that I think we were getting to a point where the concerns were building, and I had -- There would be, you know, Chelly would say, "I'm frustrated about not hearing about my students' progress in GATE," and Roseanna would say -- Roseanna said, "I don't have a grade on this one kid;" and there was one child whom we had formalized the process of and she was responsible for his math grade. . . . And so at that point, I felt like I need to -- I want things in writing because I need to be able to mull them over, and I want to be able to discuss with Zey[ne]p a particular incident.  So my answer to the teachers who brought me concerns is: "Put it in writing." When those teachers sent parents to me, I said the same thing to them: "I want your concerns in writing." . . .  I wasn't advertising or saying, "Could you please." When they came to me, I said: "Put it in writing.")

Furthermore, there is nothing in the e-mails from teachers and parents, or in the Letters of Direction, that indicate any discriminatory motivation based on Plaintiff's national origin or

ethnicity.  *See* [*Doc. 127-4*, Exhibit D, at 7-10]; [*Doc. 127-7*, Exhibit G]; [*Doc. 127-8*, Exhibit H]; [*Doc. 127-9*, Exhibit I]; [*Doc. 158-8*, Exhibit H]; and [*Doc. 158-37*, Exhibit NN].  Thus, even if Ms. Vandenkieboom solicited input regarding Plaintiff's work performance, the record shows that she received negative feedback in the three areas in which she then issued the Letters of Direction.  The Court further notes that Ms. Vandenkieboom testified that she was directed by Dr. Irestone to include the language stating that failure to comply with the letters will lead to more severe discipline.  *See* [*Doc. 127-3*, Exhibit C, at 5].  This further supports a finding that Ms. Vandenkieboom did not issue the letters for a pretextual reason, when the disciplinary language in the letters was not originally placed there by Ms. Vandenkieboom.

In addition, even if Ms. Vandenkieboom was wrong regarding the policies regarding submission of students' progress reports to their regular education teachers and the timeframe for submitting paperwork to the district office, Plaintiff presents no evidence that Ms. Vandenkieboom was aware of her mistakes at the time she submitted the Letters of Direction.  *See Green v. JP Morgan Chase Bank National Assn.*, No. 11-5153, 501 Fed. Appx. 727, 732, 2012 WL 5359294 (10th Cir. Nov. 1, 2012) (unpublished) ("It is well-established that [a court's] role isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs.") (citation and internal quotation marks omitted).  Moreover, the Tenth Circuit has stated that it "afford[s] substantial latitude to employers in making discipline[-]related decisions, and [is] reluctant to act as a super personnel department that second guesses employers' business judgments."  *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004) (citation and internal quotation marks omitted).

Plaintiff also provides no evidence that Defendants backdated her offer of employment or failed to mail it for a week.   Plaintiff does not present any evidence that the letter was postmarked after May 7, 2012, and simply submits the letter which is clearly dated May 7, 2012, and states that it was postmarked after that date.   While it appears that Defendants should have allowed time for the mailing of the letter to Plaintiff in their calculation of the fifteen days, since Plaintiff did not receive the letter the same day it was issued, Plaintiff fails to present evidence that Defendants' "tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (citation and internal quotation marks omitted).   This is especially true since Defendants accepted Plaintiff's notice of acceptance of the job offered once she brought to Defendants' attention the fact that she had not received the offer until May 19, 2012.   Plaintiff has presented no evidence that raises an inference that Defendants' legitimate, nondiscriminatory explanations for the letters or withdrawal of the offer of employment are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011) (citation and internal quotation marks and brackets omitted).   Therefore, in the absence of any evidence that Defendants lacked a good-faith belief in the legitimacy of the complaints about Plaintiff or the untimeliness of Plaintiff's return of her offer of employment, the Court finds that summary judgment should be granted on Plaintiff's national origin and race discrimination claims.

## II.  Retaliation
### (Title VII, NMHRA, § 1981, and Equal Protection Clause Claims)

Title VII prohibits retaliation against employees for opposing any practice that Title VII makes unlawful, or for asserting a charge, testifying, assisting or participating in any manner in

an investigation, proceeding, or hearing under Title VII.  *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998).  To establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) the employer took an adverse employment action against her subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action that the employer took.  *See id.* at 1262-63, and *Mattioda v. White*, 323 F.3d 1288, 1293 (10th Cir. 2003).  Plaintiff contends that she was retaliated against for the following reasons: (1) she sent a letter to Assistant Superintendent Dean on March 10, 2011, alleging Ms. Vandenkieboom was targeting her "because of her culture and national origin" and, four days later, Ms. Vandenkieboom issued Plaintiff the three Letters of Direction which "tends to show that they were motivated by the report" (*Doc. 158* at 40-41); (2) Plaintiff filed a grievance on April 6, 2011, after which Defendants told Plaintiff that Ms. Vandenkieboom would continue to supervise Plaintiff and Plaintiff was removed from her classroom and assigned to a portable behind the school, even though Dr. Irestone, the Human Resources Director, told Plaintiff earlier that she would remove Ms. Vandenkieboom from supervising Plaintiff (*id.* at 41); and (3) after Plaintiff filed a charge of discrimination on January 13, 2012, Defendants "manufactur[ed] a timeliness problem" and terminated Plaintiff because Plaintiff failed to timely submit her Notice of Intent to Rehire (*id.*).

With regard to Plaintiff's first charge of retaliation, the Court finds that the letter Plaintiff sent to Assistant Superintendent Dean was a protected activity.  While Defendants contend that the letter was not a protected activity, the case relied on by Defendants for this contention is an unpublished case finding that a complaint about a co-worker's isolated racial slur was not

protected opposition, as no reasonable person would believe it violated discrimination statutes.
[*Doc. 149* at 16] (citing *Robinson v. Cavalry Portfolio Services, LLC*, Nos. 08-5020, 08-5022,
365 Fed. Appx. 104, 113-114, 2010 WL 447000 (10th Cir. Feb. 10, 2010) (unpublished)).  Here,
however, the letter to Assistant Superintendent Dean stated that Plaintiff "wonder[ed] if
[Ms. Vandenkieboom] has a problem with [her] because of [Plaintiff's] culturally different
background or for some other reason."  [*Doc. 127-12*, Exhibit L, at 3].  She further stated that
"all of this is appropriate cause for me to believe that [Ms.] Vandenkieboom is biased against
me."  *Id.* at 4.  The Court finds that this statement is closer to the letter in *O'Neal v. Ferguson
Construction Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001) which the Tenth Circuit found was a
protected activity, because that letter was an informal complaint disclosing the plaintiff's
dissatisfaction with his new position, and characterized the reassignment as retaliatory conduct.
The Tenth Circuit further noted that "[w]hether O'Neal or his attorney wrote the letter is wholly
irrelevant."  *Id.*  While Plaintiff's letter does not use the terms "retaliatory" or "discrimination,"
it could still be characterized as complaining of discriminatory conduct.  The Court, therefore,
finds that the letter was a protected activity.  The Court has determined *supra* that the Letters of
Direction were adverse employment actions, and the issuance of those letters took place after
Plaintiff sent the letter to Assistant Superintendent Dean, so Plaintiff has satisfied both the first
and second prongs to establish a *prima facie* case for retaliation.

Next, the Court must determine whether there is a causal connection between Plaintiff
sending the letter to Assistant Superintendent Dean and Ms. Vandenkieboom issuing Plaintiff the
Letters of Direction.  To establish a causal connection by temporal proximity, the plaintiff may
produce evidence showing an inference of retaliatory motive by showing protected conduct
followed closely by an adverse action.  *See O'Neal*, 237 F.3d at 1253 ("We have held that a one

and one-half month period between protected activity and adverse action may, by itself, establish causation.  By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.") (citation and internal quotation marks omitted).  In addition, to establish a causal connection, the plaintiff must show that the management personnel responsible for making the employment decision had knowledge of the plaintiff's protected acts.  *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).  Here, the Letters of Direction were issued just four days after Plaintiff sent her letter to Assistant Superintendent Dean complaining of her treatment by Ms. Vandenkieboom, which indicates a causal connection by temporal proximity.  However, Plaintiff presents no evidence that Ms. Vandenkieboom was aware of the letter that had been sent to Assistant Superintendent Dean.  Ms. Vandenkieboom testified in her deposition that she was not sure whether she ever read or received the letter that Plaintiff had sent to Assistant Superintendent Dean.  *See* [*Doc 158-5*, Exhibit E, at 11] (stating "I'm not sure [Assistant Superintendent Dean] ever told me about that letter.").  Ms. Vandenkieboom further testified that the reason she issued the Letters of Direction was not based on the letter to Assistant Superintendent Dean but, rather, was because she did not think that Plaintiff was going to address the issues she raised with her on March 4, 2011.  *Id.*  Plaintiff, therefore, is unable to show that the person responsible for making the employment decision had knowledge of Plaintiff's protected act, and, thus, cannot establish a *prima facie* case of retaliation with regard to the Letters of Direction.

With regard to Plaintiff's second charge of retaliation, the Court finds that Plaintiff engaged in a protected activity by filing a grievance with the school district.  *See Robbins v. Jefferson County School Dist. R-1*, 186 F.3d 1253, 1258 (10th Cir. 1999) ("Title VII extends protection to those who informally voice complaints to their superiors or who use their

employers' internal grievance procedures.") (citation and internal quotation marks and ellipsis omitted), abrogated on other grounds by *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). However, the actions Plaintiff contends occurred after she engaged in this protected activity -- that Defendants told Plaintiff that Ms. Vandenkieboom would continue to supervise Plaintiff and Plaintiff was removed from her classroom and assigned to a portable behind the school -- do not constitute adverse employment actions. *See, e.g., Peru v. T-Mobile USA, Inc.*, 897 F.Supp. 2d 1078, 1096 (D. Colo. 2012) (finding that "the denial of a shift change request, predicated on a desire for a different supervisor but otherwise involving no material changes to the employees' responsibilities or pay" does not constitute an adverse employment action) (citation omitted), and *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (explaining that an action that is "a mere inconvenience or an alteration in job responsibilities" is not an adverse employment action) (citation and internal quotation marks omitted). Therefore, Plaintiff fails to establish a *prima facie* case of retaliation regarding filing her April 6, 2011, grievance.

Finally, the Court considers Plaintiff's third charge of retaliation -- that she was retaliated against for filing a charge of discrimination with the EEOC on January 13, 2012, by Defendants "manufacturing a timeliness problem with the return of [Plaintiff's] notice of intent to hire and terminat[ing] her on that basis" by issuing the July 6, 2012 letter. [*Doc. 158* at 41]. The Court finds that Plaintiff engaged in a protected activity by filing the EEOC charge of discrimination (*see Anderson v. Coors Brewing Co.*, 181 F.3d at 1178 (explaining that an employee engages in protected activity when he or she files an EEOC charge)), and the Court has previously found that the withdrawal of Plaintiff's offer of employment was an adverse employment action. However, Plaintiff fails to show that there was a causal connection between the protected activity

and the employment action.  There is no presumption of a connection based on temporal proximity, as the employment action took place at least six months after the protected activity. Moreover, Plaintiff has not presented any evidence showing that Defendants "manufactured" the timeliness issue regarding her offer of employment, and the Court has already found that Defendants made a showing that the withdrawal of the offer could reasonably have been based on Plaintiff's failure to return the offer within the timeframe set forth in the offer.  *See id.* at 1179 (explaining that "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation," and finding that a three-month period standing alone is insufficient to establish causation) (citation omitted).  Therefore, the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliation based on the filing of her EEOC charge and the withdrawal of the offer of employment.  For these reasons, the Court finds that summary judgment should be granted on Plaintiff's retaliation claims.

### III.  Hostile Work Environment
### (Title VII and NMHRA Claims)

To establish a prima facie case of hostile work environment harassment, a plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.  *Bloomer v. United Parcel Serv., Inc.*, Nos. 02-6348, 03-6002, 94 Fed. Appx. 820, 825, 2004 WL 823495 (10th Cir. April 16, 2004) (unpublished). To establish a hostile work environment claim, a plaintiff must "show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment."  *Anderson v. Clovis Municipal Schools*, No. 07-2160, 265 Fed.

Appx. 699, 706-707, 2008 WL 410435 (10th Cir. Feb. 15, 2008) (unpublished) (citation and internal quotation marks and brackets omitted).  In addition, a plaintiff must "show that he was targeted for harassment because of his race or national origin."  *Id.* at 707 (citation and internal quotation marks and brackets omitted).   To survive summary judgment, a plaintiff must demonstrate more than "a few isolated incidents of racial enmity or sporadic racial slurs." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (citation and internal quotation marks omitted).  Instead, the plaintiff must show that there was "a steady barrage of opprobrious racial comments."  *Id.*   The Tenth Circuit has explained that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish a *prima facie* hostile work environment claim.   *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).   In evaluating a hostile work environment claim, the Court should consider: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citations and internal quotation marks omitted).

Similar to her claim for constructive discharge as an adverse employment action, Plaintiff alleges a hostile work environment based on the actions of Ms. Vandenkieboom and her staff, as set forth *supra*.  *See* [*Doc. 158* at 39].  Specifically, Plaintiff contends that her workplace was intolerable because: "[Ms.] Vandenkieboom belittled Plaintiff for her accent and disparaged her intellect and job performance in front of the other teachers, staff, students, and parents[;] Defendants threatened to terminate Plaintiff for manufactured performance errors[;] [Ms.] Vandenkieboom induced Plaintiff to carry a load of nearly double the amount of students she was allowed by state law and refused to provide her any assistance[; Ms.] Vandenkieboom,

Assistant Superintendent Dean, and [Dr.] Irestone aggressively confronted Plaintiff while she was in the middle of a class and told her that she was not allowed to transfer and that she would be moved behind the school to a portable classroom." *Id.*

The Court finds that some of these allegations are not supported by the record and, with regard to the allegations that are supported by evidence in the record, those allegations do not rise to the level of a hostile work environment. Plaintiff's statement that Ms. Vandenkieboom "induced" her to carry a load of nearly double the amount of students she was allowed by state law is not supported by any evidence in the record, and is contradicted by Plaintiff's letter to Assistant Superintendent Dean stating that Plaintiff "accepted a very large caseload this year." Plaintiff's statement that Ms. Vandenkieboom "refused to provide her any assistance" with her large caseload is also contradicted by Defendants' contention that Ms. Vandenkieboom assigned staff members in the school to assist Plaintiff until an Instructional Assistant was hired in February 2011. *See* [*Doc. 127* at 5] and [*Doc. 127-3*, Exhibit C, at 7]. While Plaintiff states that this assistance was only sporadic and without continuity of personnel (*see Doc. 158* at 4), she does not dispute the fact that she was given help. Plaintiff also fails to produce any evidence that she requested help and that such a request was denied. In addition, while Plaintiff conclusorily states that the work environment "interfered with [her] job performance" (*Doc. 158* at 39), Plaintiff fails to state with any specificity how her job performance was affected by her allegations of national origin discrimination.

The facts of this case are similar to those in *Anderson v. Clovis Municipal Schools*, where an African-American special education teacher claimed racial discrimination by his principal based on allegations that the principal treated him more harshly compared to non-African-American teachers at the school; subjected his teaching to greater scrutiny;

evaluated him more frequently; and was generally disrespectful in his interactions with the plaintiff. 265 Fed. Appx. at 701. The plaintiff alleged that his principal unfairly placed him on a professional growth plan, yelled at the plaintiff in a meeting with other teachers in a humiliating and degrading manner in front of colleagues, implied that the plaintiff had been involved with the theft of the plaintiff's laptop, provided other teachers with equipment that the plaintiff was denied, and required the plaintiff to teach a heavier caseload than the other special education teacher at the school. *Id.* at 701-702. The plaintiff also alleged that he unfairly received a formal reprimand for unruly student behavior in his classroom, was denied participation in an after-school program in which he had earned extra income for his participation in the past, was removed from his case-manager duties, denied him the opportunity to mentor fellow teachers, and subjected to unnecessary observation by a third party. *Id.* at 702. The Tenth Circuit stated that the plaintiff did not accuse the principal or anyone else at the school of making "overtly discriminatory remarks," but noted that the plaintiff stated that the Assistant Superintendent stated that the principal may have a problem with the plaintiff's race because the Assistant Superintendent was from Carlsbad, New Mexico, and that the Assistant Superintendent once told the plaintiff that he was glad to have the plaintiff at the school "as a minority, . . . but not as a teacher." *Id.* The Tenth Circuit upheld the district court's order granting summary judgment to the defendants in that case, finding that the plaintiff's allegations did not constitute a hostile work environment, stating that the plaintiff "failed to produce any evidence tending to show that anyone at Bella Vista harbored racial animus towards him," and that the assistant superintendent's remarks did not create a fact issue under the totality of the circumstances test because "[a] pervasively hostile work environment is not established by demonstrating a few

isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments." *Id.* at 707 (citation omitted).

Similarly, here, Plaintiff does not produce evidence tending to show that anyone at Aspen Elementary School harbored racial animus towards her.  The only direct comment to Plaintiff about her race was the "turkey from Turkey" comment by a staff member, for which the staff member was immediately regretful and apologized "prolifically" to Plaintiff for making the comment.  *See* [*Doc. 149-1*, Exhibit A, at 2].   All of Plaintiff's other allegations concerning disparaging racial or ethnic remarks were not directed to Plaintiff and are obscure in their racial implications.  *See Faragalla v. Douglas County School Dist. RE 1*, Nos. 09-1393, 10-1433, 411 Fed. Appx. 140, 154, 2011 WL 94540 (10th Cir. Jan 12, 2011) (unpublished) (finding that the plaintiff did not produce sufficient evidence to show a hostile work environment when "she produced no evidence she was ever subjected to unambiguously derogatory epithets during her employment with [the school district]").  Moreover, the allegations do not set forth a showing of a "steady barrage of opprobrious racial comments."  The Court notes the difference between the facts presented in this case and the facts in *Hernandez*, where the Tenth Circuit found evidence of a hostile work environment when the plaintiff presented evidence of repeated racially insensitive and objective comments and jokes directed at the plaintiff, the plaintiff's supervisor accusing the plaintiff's family member of being a murderer based on the plaintiff's surname, accusations of the plaintiff not paying for lunch, and referring to a black cook using a racial epithet.  684 F.3d at 958.  In *Hernandez*, the Tenth Circuit also noted that the plaintiff promptly and frequently complained to her supervisors about the offensiveness of the racial comments (*id.*), whereas here, Plaintiff has not presented evidence of objecting with any specificity to the derogatory comments made to or about non-white or foreign-born students or parents which she

40

found offensive. Instead, Plaintiff stated in her March 10, 2011 letter to Assistant Superintendent Dean that she "wonder[ed] if [Ms. Vandenkieboom] has a problem with [her] because of [Plaintiff's] culturally different background or for some other reason." [*Doc. 127-12*, Exhibit L at 3]. In addition, as noted *supra* in the Court's consideration of Plaintiff's constructive discharge claim, evidence in the record shows that Plaintiff was not present for some of the statements allegedly made by Ms. Vandenkieboom and the school staff regarding non-white or foreign-born students and their families. *See, e.g.,* [*Doc. 158-4*, Exhibit D, at 14] (Plaintiff's deposition testimony, stating that she did not hear Ms. Vandenkieboom make derogatory remarks about Hispanic families and was not aware of the police officer being sent to a family's home to obtain consent for a Special Education referral). For these reasons, the Court finds that Plaintiff has not made a showing of a hostile work environment and Defendant's motion for summary judgment should be granted on this claim.

### IV.  Section 1983 Due Process Claims

Defendants contend that Plaintiff's substantive due process claims based on the grievance procedure and the withdrawal and reinstatement of the offer of employment in the summer of 2012 should be dismissed because Plaintiff did not suffer any loss of pay or change in her work status or conditions as a result of the withdrawal and reissuance of her offer of employment. [*Doc. 127* at 34]. Defendants further contend that there is no evidence that they acted in an arbitrary or capricious manner. *Id.* Defendants contend that Plaintiff's procedural due process claim should be dismissed because Plaintiff was not deprived of a property interest as she was not terminated from employment, she continues to be employed with the school district, and she received constitutionally adequate due process during the grievance procedure. *Id.*

In response, Plaintiff contends that Defendants violated her procedural due process rights because their "constructive discharge of Plaintiff and inducement of her to take unpaid leave rather than face the objectively unreasonable treatment was without notice and an opportunity to be heard." [*Doc. 158* at 50]. Plaintiff contends that Defendants violated her substantive due process rights because she was induced to take unpaid leave and because she was terminated without cause in the spring of 2012 and it was not until she obtained counsel that she was rehired. *Id.*

"Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (citations omitted). Thus, "to prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived [the] plaintiff of a protectible property interest." *Id.* (citations omitted); *see also American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty," and "[o]nly after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process.") (citations and internal quotation marks omitted).

Plaintiff first contends that she was deprived of her procedural due process rights because she was constructively discharged and "induced" into taking unpaid medical leave. [*Doc. 158* at 50]. The Court has already rejected Plaintiff's claim that she was constructively discharged. The Court has also already found that Plaintiff has failed to present any evidence that she was "induced" into taking medical leave. Therefore, the Court finds that Plaintiff has failed to show

that she was deprived of a protectable property interest with regard to the year of unpaid medical leave.  In addition, even if the Court were to find that Plaintiff's year of medical leave constitutes the deprivation of a protectable property interest, Plaintiff fails to state with any specificity what procedural due process she was denied with regard to that leave, other than stating she was denied "notice and an opportunity to be heard."  [*Doc. 158* at 50].  Plaintiff fails to explain what notice Defendants were supposed to give her before Plaintiff decided to take the year of unpaid medical leave, or how she was deprived of an opportunity to be heard regarding taking the leave.

The evidence shows that Plaintiff applied for the Family Medical Leave Act on August 8, 2011, asking for "4-6 months" of leave.  [*Doc. 158-24*, Exhibit Y, at 1].  This leave request was approved by the LAPS Human Resources Coordinator on August 12, 2011.  *Id.* Attached to Plaintiff's application is a Medical Certification Statement, in which Plaintiff's doctor states that Plaintiff has a "serious health condition" involving "significant cognitive issues manifested by panic disorder, symptoms of depression and post[-]traumatic stress."  *Id.* at 2. Plaintiff's doctor sent subsequent letters to the Superintendent informing him that Plaintiff could not return to work "for a minimum of three months beginning [August 1, 2011]" (*Doc. 158-17*, Exhibit R), then "for the balance of this semester . . . [and] extended through 01/01/12" (*Doc. 158-16*, Exhibit Q), then extended until "at the earliest, 04/09/2012" (*Doc. 158-18*, Exhibit S), and finally "for the remainder of the school year" (*Doc. 158-19*, Exhibit T).  *See also* [*Doc. 158-25*, Exhibit AA] (in which Plaintiff stated she was "extending [her] current medical leave of absence for the remainder of the 2011-2012 school year" and "will be returning from [her] medical leave of absence for the 2012-2013 school year.").  This latter leave was approved by the Superintendent five days after it was received by LAPS.  *Id.*  Plaintiff has not presented any evidence of any procedures that were not followed by Defendants.  She claims she was

43

denied an opportunity to be heard, yet her requests for medical leave for the entire 2011-2012 school year were repeatedly approved. Therefore, the Court finds that summary judgment should be granted as to Plaintiff's procedural due process claim.

Second, Plaintiff contends that the withdrawal of her offer of employment was in violation of her substantive due process rights because it was done without cause. *Id.* The Court finds that Plaintiff has made a showing that she possessed a protected property interest in her continued employment. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir.1998) (explaining that "[t]he standard for the existence of a property right in employment is whether the plaintiff has a legitimate expectation of continued employment") (citations omitted). However, the Court has already found that Defendants have stated a legitimate, nondiscriminatory reason for withdrawing the offer of employment because Plaintiff submitted her signed offer past the required fifteen days as stated in the offer. Moreover, after learning that Plaintiff had received the offer later than Defendants had thought, Defendants reinstated the offer, and Plaintiff has presented no evidence that the withdrawal of the offer was based on discriminatory animus. Therefore, the Court finds that Plaintiff's deprivation of this protected property interest was not for an arbitrary reason and summary judgment should be granted as to Plaintiff's substantive due process claim. *See Babbar v. Ebadi*, No. 99-3040, 216 F.3d 1086, 2000 WL 702428, at *10 (10th Cir. May 26, 2000) (unpublished) (explaining that "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges'") (citation omitted). Plaintiff's allegations regarding Defendants' actions do not shock the conscience of this Court.

## V.  Americans With Disabilities Act

Defendants move to dismiss Plaintiff's ADA claim because they claim that she is not a qualified individual with a disability under the ADA based on her inability to work with Ms. Vandenkieboom.  [*Doc. 127* at 35-36].  Defendants further contend that Plaintiff's medical records show that Plaintiff's collapse was not entirely caused by work-related stress, and that Plaintiff has been provided all of the accommodations she requested as she is now working at a different school and is not supervised by Ms. Vandenkieboom.  *Id.*

In response, Plaintiff states that her ADA claim stems from her acceptance of the school district's offer of employment in Spring 2012 contingent upon her being placed with another supervisor.  *See* [*Doc. 158* at 41-42] (citing *Doc. 158-42*, Exhibit SS, letter from school district in response to Plaintiff's request for accommodation).  Plaintiff contends she is a qualified individual with a disability because she was diagnosed with depression and anxiety by Drs. Church and Heron, which impose limitations on a major life activity, and because her personnel records show a diagnosis of post-traumatic stress disorder (PTSD), which is a disability under the ADA.  *Id.* at 43.  Plaintiff contends that "her depression and anxiety substantially limit her major life activities of[] concentrating, thinking, sleeping, and brain functioning."  *Id.* at 44.  Plaintiff next contends that Defendants failed to accommodate her by refusing to reassign her to a different school before the start of the 2012-2013 school year, which would have been a reasonable accommodation.  *Id.* at 44-45.  Plaintiff contends that this issue is not moot, even though she was subsequently assigned to a different school, because she was terminated on July 6, 2012, and rehired with the school reassignment in August 2012, so her claim is based on this one-month time period.  *Id.*

In reply, Defendants contend that Plaintiff is not a qualified individual under the ADA based on her stress related to interacting with Ms. Vandenkieboom, and that Plaintiff did not provide notice of her disability to the school district to invoke the ADA process. [*Doc. 149* at 17-18]. Defendants contend that the July 6, 2012 letter was not a termination of Plaintiff's employment on the basis of her request for accommodation but, instead, explained that the school district had intended to rehire Plaintiff and assign her to a different elementary school, but her untimely response to the letter forfeited Plaintiff's right to reemployment. *Id.* at 18. Defendants state that Plaintiff's earlier requests for a change in supervisor did not inform the school district that Plaintiff had a disability and was requesting another supervisor as an accommodation under the ADA. *Id.*

The ADA prohibits discrimination against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." 42 U.S.C. § 12112(b)(5)(A). "To establish a prima facie case of discrimination under the ADA, an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability. *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004) (citation omitted). The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The burden shifting analysis in the Title VII context established in *McDonnell Douglas* is the same under the ADA, wherein a plaintiff must first

establish a *prima facie* case of discrimination, after which the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  If the defendant offers such a reason, the burden shifts back to the plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the action in question is pretextual.  *See Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109 (10th Cir. 1999).

The Court finds that Plaintiff has failed to demonstrate that she is a qualified individual under the ADA.  Plaintiff contends that her diagnoses of anxiety, depression and PTSD render her a qualified individual because they affect her ability to concentrate, think, and sleep, and limit her brain functioning.  [*Doc. 158* at 44].  However, these diagnoses were made in relation to Plaintiff's stress in working with Ms. Vandenkieboom as her supervisor.  As the Tenth Circuit has held, "the major life activity of working cannot be substantially impaired if a plaintiff cannot work under a certain supervisor because of the stress and anxiety it causes."  *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1276 (10th Cir. 2005) (citations and internal quotation marks omitted).  Plaintiff fails to present any evidence that her disabilities are ongoing absent her being supervised by Ms. Vandenkieboom, and the medical evidence refutes any such claim as Plaintiff's doctors wrote that Plaintiff could return to work as long as she was not supervised by Ms. Vandenkieboom.  *See* [*Doc. 158-29*, Exhibit EE] and [*Doc. 158-30*, Exhibit FF, letter from Dr. Heron, stating that Plaintiff "had no history of anxiety or other psychological conditions prior to her experience with Ms. Vandenkieboom at Aspen Elementary School," and that she is able to return to work as long as she is not supervised by Ms. Vandenkieboom].  Therefore, the Court finds that Plaintiff is not a qualified individual under the ADA.

In addition, even if the Court were to find that Plaintiff is a qualified individual under the ADA, and that Plaintiff has established a *prima facie* case of disability discrimination based on

the July 6, 2012 letter, the Court has already found that Defendants have stated a legitimate, non-discriminatory reason for terminating Plaintiff because she did not return the offer of employment in a timely manner.  The Court has further found that Plaintiff has failed to establish a genuine issue of material fact as to whether Defendants' reason was pretextual.  While Plaintiff contends that the July 6, 2012, letter from counsel for the school district to Plaintiff's counsel is direct evidence of discrimination on the basis of Plaintiff's disability "because Defendants actually told Plaintiff that they were terminating her because of her request for accommodation of reassignment away from [Ms.] Vandenkieboom" (*Doc. 158* at 42), the Court disagrees with Plaintiff's characterization of the language in the July 6, 2012 letter.  The letter does not state that Plaintiff is being terminated on the basis of her alleged disability or her request for an accommodation of her disability; instead, the letter states that it is written regarding the arbitration of Plaintiff's grievance, which was ongoing at that time, and states that by failing to timely return her Letter of Intent to Rehire in the time frame required by law, Plaintiff "forfeited her right to reemployment under N.M. Stat. Ann. § 22-10A-23(A) (2003)."  [*Doc. 158-42*, Exhibit SS, at 1].  Counsel for the school district goes on to ask how Plaintiff intends to address this issue in light of her ongoing grievance arbitration, and asks whether the arbitration has been rendered moot in light of Plaintiff conditioning her acceptance of a contract based on certain demands.  *Id.*  While counsel for the school district denies Plaintiff's claim that she is disabled, states that Plaintiff has failed to participate in the process required under the ADA, and contends that Plaintiff's requests for accommodation are unreasonable (*id.* at 2-4), the letter does not state that Plaintiff was terminated on the basis of her alleged disability or her request for accommodation.  The letter, instead, states that Plaintiff's right to reemployment was forfeited based on the untimeliness of her return of the offer of employment.  Therefore, the Court finds

that Defendants' motion for summary judgment should be granted as to Plaintiff's claim for discrimination under the ADA.

## VI. Conspiracy

Defendants contend that summary judgment should be granted on Plaintiff's conspiracy claim because Plaintiff cannot establish a case of national origin discrimination and because Plaintiff cannot establish the elements of a conspiracy claim.  [*Doc. 127* at 37].   In response, Plaintiff states that her conspiracy claim under § 1985(3) is based on Ms. Vandenkieboom's conspiracy to deprive Plaintiff of equal protection of the laws when she solicited other teachers to make meritless complaints about Plaintiff in writing and pressed another school district employee for negative information about Plaintiff.  [*Doc. 158* at 48-49].[14]  Plaintiff also contends that Ms. Vandenkieboom and Dr. Irestone engaged in a conspiracy by telling Plaintiff that they would remove the letters from her file and reassign her to a new supervisor, and then did not do so, and that there was a conspiracy based on Ms. Vandenkieboom, Dr. Irestone, and Assistant Superintendent Dean "aggressively" confronting Plaintiff in her classroom and telling her that Ms. Vandenkieboom would continue as Plaintiff's supervisor and that Plaintiff would be moved to a portable classroom.  *Id.* at 49.   Finally, Plaintiff contends that Superintendent Schmidt conspired with Ms. Vandenkieboom because he "failed to remedy the situation in spite of verbally committing that he would do so," by allowing Dr. Irestone to dismiss Plaintiff's grievance on July 19, 2011, by "support[ing] LAPS' further isolation of Plaintiff and minimization of [Ms.] Vandenkieboom's shameful treatment of her through the grievance

---

[14]   Plaintiff's contention that Ms. Vandenkieboom pressed a school district employee for negative information about Plaintiff is not supported by the school district employee's deposition testimony.  *See* [*Doc. 158-1*, Exhibit A, at 9] (employee Karla Crane stating that Ms. Vandenkieboom asked her if there were any issues about Plaintiff that should be addressed, and stating that she did not find the question odd because "Principals call all the time trying to wade through all the requirements of special education").  In addition, Plaintiff does not provide any support for her contention that Ms. Vandenkieboom solicited *meritless* complaints about Plaintiff.

process," and by "authoriz[ing the] termination of Plaintiff in July 2012 for the manufactured problem with the return of her intent to hire letter." *Id.* Plaintiff contends that these acts "show a meeting of the minds between Defendants and their agents." *Id.*

Section 1985(3) does not in itself create any substantive rights. *Gallegos v. City and County of Denver*, 984 F.2d 358, 362 (10th Cir. 1993) (explaining that "§ 1985(3) does not provide a substantive right, but is a procedural statute which provides a remedy for a deprivation of an existing right") (citing *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir.1990)). The elements of a § 1985(3) claim are: "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citation omitted). In addition, a § 1985(3) claim requires proof of a conspiracy "motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (citation and internal quotation marks omitted).

The Court finds that Plaintiff has failed to make showing of a conspiracy motivated by "racial . . . invidiously discriminatory animus." For the reasons more fully set forth above, regarding Plaintiff's claims for discrimination, retaliation, and hostile work environment, Plaintiff has failed to show that Defendants acted in a racially discriminatory manner towards Plaintiff. In addition, the Court finds that Plaintiff has not established that there was a meeting of the minds or an agreement among Defendants, motivated by discrimination, to deprive Plaintiff of her equal protection rights. *See Gallegos*, 984 F.2d at 364 (finding that, "[w]ithout such evidence, even a 'common sense approach' would not give rise to the inference that a discriminatorily motivated conspiracy existed which acted to deprive plaintiff of equal

protection") (citations omitted).  For these reasons, the Court finds that Defendants' motion for summary judgment should be granted as to Plaintiff's conspiracy claim.

### VII.  Breach of Employment Contract

Plaintiff contends that her express employment contract with LAPS was violated when "Defendants constructively discharged [her] when they forced her to take unpaid medical leave for the 2011-12, thereby terminating her for that school year," and by terminating her in July 2012 for the 2012-13 school year "though they eventually reassigned her to another school after confronted with legal action."  [*Doc. 158* at 47].  Plaintiff contends that both of these terminations were without just cause, in violation of the New Mexico School Personnel Act, N.M.S.A. § 22-10A-2(G).  *Id.*  Plaintiff further contends that Defendants breached Plaintiff's employment because their reasons for the terminations were pretextual and unsubstantiated, and because Defendants were motivated by discriminatory malice and retaliation and violated Plaintiff's civil and constitutional rights.  *Id.*  In addition, Plaintiff contends that when Defendants "discriminat[ed] against Plaintiff on the basis of her national origin, race, and/or disability, including constructively discharging her, retaliated against her, and subjected her to a hostile work environment, they breached her implied employment contract by failing to follow the prescribed disciplinary procedures."  *Id.* at 48.

The Court has found *supra* that Plaintiff has failed to make a showing that she was forced to take unpaid medical leave, and that Defendants made a showing that they terminated her employment in July 2012 based on her failure to return her offer of employment within the prescribed timeframe.  The Court has also found that Plaintiff's claims for discrimination, constructive discharge, retaliation, and hostile work environment should be dismissed.

Therefore, the Court finds that Plaintiff's claim that her employment contract was breached should also be dismissed as it is dependent on a finding in her favor as to her other claims.

## CONCLUSION

Having relied on specific facts that were supported by the record before the Court, while drawing <u>reasonable</u> inferences therefrom in the light most favorable to Plaintiff, the Court has found that no genuine issue of material fact exists and Defendants are entitled to judgment as a matter of law.  The Court notes that in making its determination it cannot rely on Plaintiff's conclusory allegations and the contentions of her counsel.  Therefore, for the foregoing reasons, the Court finds that Defendants' motion for summary judgment should be granted and all of Plaintiff's claims should be denied.  Specifically, the Court finds that: (1) Plaintiff has failed to show that Defendants' legitimate, nondiscriminatory reasons for their adverse employment actions were pretextual; (2) Plaintiff has failed to establish a case for retaliation; (3) Plaintiff has failed to establish a hostile work environment claim; (4) Plaintiff has failed to set forth claims for § 1983 substantive or procedural due process; (5) Plaintiff has failed to establish a claim under the Americans with Disabilities Act; (6) Plaintiff has failed to establish a conspiracy claim under § 1985(3); and (7) Plaintiff has failed to show that her employment contract was breached.

**IT IS THEREFORE ORDERED** that ***Defendants' Motion for Summary Judgment and Memorandum in Support*** *(Doc. 127)* is **GRANTED**.

**IT IS SO ORDERED.**

_Lourdes A. Martínez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**